Filed 11/1/23  Young v. Hill CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| SERENA YOUNG,<br><br>        Plaintiff, Cross-defendant and Appellant,<br><br>        v.<br><br>PHILIP E. HILL,<br><br>        Defendant, Cross-complainant and Appellant;<br><br>PHILIP E. HILL, M.D., INC.,<br><br>        Defendant and Appellant. | B306769<br><br>Los Angeles County<br>Super. Ct. No. NC061797 |

APPEALS from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Reversed in part and remanded.

Tredway Lumsdaine & Doyle, Roy J. Jimenez and Brandon L. Fieldsted for Plaintiff, Cross-defendant and Appellant Serena Young.

Daniel E. Park Law Corporation, Daniel E. Park and Samuel F. Izzo for Defendants, Cross-complainant and Appellants Philip E. Hill and Philip E. Hill, M.D., Inc.

———————————

Serena Young and Philip Hill jointly own an orthopedic surgery practice called Long Beach Advanced Orthopedic Medical Center, Inc. (LBAO).  After nearly two decades working together, Young discovered that Hill had been depositing checks into his own account, which she believed belonged to the practice.  Young sued Hill and his corporation for, among other things, breach of contract, breach of fiduciary duty, fraud, and conspiracy.  Hill, in turn, filed a cross-complaint against Young and her corporation, alleging Young failed to contribute an equal share to the partnership.

The case proceeded to trial, but before submitting it to the jury, the court granted a directed verdict for Hill on Young's fraud and conspiracy claims, as well as her request for punitive damages.  On the remaining claims, the jury found in Young's favor and awarded her more than $1 million in damages.  The jury's award included damages for lost profits, the loss in value of Young's ownership interest in LBAO, and interest.  After trial, the court eliminated the jury's award of interest and reduced the damages related to the value of LBAO.  Both Hill and Young appealed.

On appeal, Hill argues Young was not entitled to any damages related to her ownership interest in LBAO.  He also challenges the sufficiency of the evidence supporting the jury's verdict.  We reject each of Hill's arguments.

In her cross-appeal, Young argues the court erred by granting directed verdicts for Hill, eliminating the jury's interest

2

award, and reducing her damages by $150,000. We agree with Young in part, concluding the court erred in granting a directed verdict on her fraud claim and request for punitive damages, eliminating the jury's award of interest, and reducing the jury's award of loss-of-value damages. Accordingly, we reverse the judgment in part and remand the case for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The LBAO agreement*

Young and Hill are orthopedic surgeons who met while they were both employed by Harriman Jones Medical Group (Harriman Jones). When Harriman Jones closed its orthopedic department, Young and Hill decided to go into private practice together.[1]

In 1999, Hill and Young incorporated a business for the purpose of practicing orthopedic medicine, which later became LBAO. Young and Hill were the directors of LBAO, and they each owned 50 percent of its shares. Young was LBAO's CEO and performed all administrative duties until 2016. Young and Hill also set up individual corporations—Serena Young, M.D., A Professional Corporation (Young, APC) and Philip E. Hill, M.D., Inc. (Hill, Inc.)—to receive payment from LBAO. They created the individual corporations solely for "tax efficiencies."

Young and Hill made an oral agreement concerning the operation of LBAO. According to Young, she and Hill agreed to a "50/50 partnership," under which all the money they generated from their practice would go into LBAO, they would pay LBAO's

---

[1]    Most of the issues on appeal require that we view the evidence in the light most favorable to Young. Accordingly, we summarize the record in that light.

overhead expenses from those funds, and then they would evenly divide the profits.

At first, the bulk of LBAO's business came from a contract with Harriman Jones to provide orthopedic services for its patients. At some point, HealthCare Partners Affiliates Medical Group (HealthCare Partners) purchased Harriman Jones and assumed its contract with LBAO. Over the years, LBAO contracted with other insurance companies as well. As of 2008, HealthCare Partners accounted for about half of LBAO's total business.

## 2.      *The HealthCare Partners contract*

Sometime around 2008, HealthCare Partners decided it did not want Young to treat any of its patients because it had concerns over her "complication rate." Accordingly, HealthCare Partners entered into a new contract solely with Hill, which we refer to as the HealthCare Partners contract. The contract identified LBAO's office as the "primary service location" and the "remittance address," and it listed as "hospital locations" the surgery centers out of which LBAO operated. Young and Hill never discussed how to treat the income from the HealthCare Partners contract. Young believed that, because Hill would continue to service the HealthCare Partners patients through LBAO, income received under the contract would be governed by the parties' oral partnership agreement.

LBAO treated HealthCare Partners patients the same as any other patient of the practice. The patients came to LBAO's office for appointments, checked in with LBAO's receptionist, were attended to by LBAO nurses and medical assistants, consulted with LBAO's orthopedic tech, and scheduled their surgeries with LBAO's scheduler. LBAO paid for all the

4

overhead associated with treating the patients, including rent, staffing, equipment, taxes, billing, and collections.

### 3. *Young reduces her hours*

In 2014, Young began suffering complications from a childhood polio infection, and she told Hill she was considering reducing her work schedule. Hill told her that was fine with him. The next year, Young stopped taking emergency room calls, which had required that she stay up the entire night. She otherwise continued to perform the same work for LBAO. Hill did not raise any concerns with Young about her reduced work schedule.

### 4. *Young discovers Hill is diverting income*

For many years, LBAO handled its billing internally. An LBAO employee would collect checks from the insurance companies and fill out corresponding bank deposit slips. The employee then gave the checks to Hill, who would deposit them at LBAO's bank on his way home from work.

In 2016, LBAO hired an outside company to take over its billing. As compensation, the outside company would keep a percentage of the total income it processed on LBAO's behalf. Young started noticing discrepancies between the company's fees and the reported income for LBAO; each month, the company based its fee on $15,000 to $20,000 more income than Hill had deposited into LBAO's account.

Young thought this discrepancy might correct itself over time, so she waited several months to investigate it further. When the issue had not resolved itself by the summer of 2017, Young asked an LBAO employee to try to reconcile the numbers with LBAO's bank statements. After reviewing the documents, the employee told Young the discrepancies matched the income

received under the HealthCare Partners contract, so it appeared that Hill had been pocketing those funds.

As Young was preparing to confront Hill about the issue, he came up to her and said, " 'I'm tired of taking care of you and supporting you. This is my money.' " Young told Hill he " 'didn't pay overhead on that. That wasn't the deal.' " Hill responded, " 'That's my money.' " Young was shocked and hurt because she considered Hill to be her friend. She hoped she and Hill could work out their issues, but he refused to contribute to LBAO any income from the HealthCare Partners contract.

### 5. *The complaints*

In May 2018, Young filed a complaint against Hill and Hill, Inc. for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud by concealment, breach of fiduciary duty, dissolution of corporation, conspiracy, and an accounting. Her claims were premised primarily on allegations that Hill and his corporation had been diverting funds that belonged to LBAO. In relief, Young sought compensatory and punitive damages.

Hill responded by filing a cross-complaint against Young and Young, APC for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty. According to the cross-complaint, the parties had agreed to contribute to LBAO equally, which Young breached by working fewer hours and seeing fewer patients than Hill. Hill also alleged that Young "pilfer[ed] LBAO's bank account, writing herself checks in amounts above and beyond her profit entitlement (which was to be even, 50-50, with Dr. Hill) . . . ." Like Young, Hill sought compensatory and punitive damages.

6

### 6. *Young leaves LBAO*

Without the income from the HealthCare Partners contract, Young struggled to cover LBAO's overhead expenses and was not able to pay herself much income. Therefore, when LBAO's lease ended in July 2019, Young decided to leave the practice. Young explained she was not willing to enter into a new lease with Hill, so she accepted a position with another practice. Young, however, maintained her shares in LBAO and continued to monitor its account. Hill continued working at the practice.

### 7. *The trial*

The case proceeded to trial, and Young presented evidence establishing the facts summarized above. She also presented expert testimony that Hill had diverted $535,570 in profits that otherwise would have been paid to her. Young's expert additionally opined that, as of July 2019, LBAO had been worth $674,741.

Hill testified at trial that the terms of his oral agreement with Young were somewhat different than what Young had asserted. According to Hill, the parties had agreed to "[e]qual contribution and equal distribution," meaning each party was required to contribute an equal amount to be entitled to an equal share of profits.

According to Hill, he initially deposited all the income from the HealthCare Partners contract into LBAO's account because he thought it was necessary to "keep the business running." In 2011, he started "guesstimat[ing]" how much he owed to LBAO to compensate it for overhead expenses, and he would deposit the rest of the income from the HealthCare Partners contract into his corporation's account. Hill did not discuss this practice with Young.

In 2017, Hill took a closer look at LBAO's finances and discovered he had over-contributed to the practice by a significant amount. After this discovery, he stopped contributing any money from the HealthCare Partners contract into LBAO's account.

One of Hill's experts testified that, after subtracting overhead costs, Hill had contributed approximately $600,000 more to LBAO than Young had. Another expert testified to the loss in value of LBAO caused by Young's decision to leave the practice. The expert used three different methods to value the company before Young left, and he calculated the weighted average to be $856,000. The expert explained that, without Young, the business's value was "shockingly low," and it would go bankrupt within a year.

Before submitting the case to the jury, the court granted a directed verdict for Hill on Young's fraudulent concealment and conspiracy claims, as well as her request for punitive damages. On Young's remaining claims—breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty—the jury found in her favor and awarded her $1,057,737 in damages. The jury's award consisted of $535,570 for profits taken by Hill, $222,167 in interest on those profits, and $300,000 for the "[v]alue of half of [the] business." The jury found Hill had not proven any of his claims against Young.

8. *Hill's post-trial motions*

After the trial, Hill moved for a new trial and for judgment notwithstanding the verdict (JNOV). The court found Young was not entitled to interest and the jury had awarded her excessive damages related to her loss of interest in LBAO. According to the court, because Young was no longer working at the practice, its value should be reduced by one half. The court gave Young

the option of a new trial or a reduction in her damages. Young selected the reduction in damages, and the court entered judgment.

Both parties timely appealed.

## DISCUSSION

## 1. *There was no prejudicial instructional error*

Hill argues the court erred by instructing the jury that, in connection with Young's breach of contract claim, she sought compensation for "the loss of her half interest in [LBAO]." He contends Young was not entitled to such damages because she admitted she retained her interest in LBAO as of the date of trial. Young does not contest that point. Nevertheless, she argues the court did not err because she never sought damages for the loss of her interest in LBAO. Instead, according to Young, she sought compensation for the *loss in value* of her interest in LBAO, which was a proper category of damages.

### a. *Background*

Young urged the court to instruct the jury that, in connection with her breach of contract claim, she sought damages for the "loss of her half interest" in LBAO. Hill objected, arguing Young should not be allowed to pursue such damages given she admitted she still owned her entire interest in LBAO. According to Hill, Young might be entitled to compensation for her interest in connection with the dissolution of the business, but she could not seek it as a form of damages.

Young explained her theory of damages was that, had Hill not breached the contract, "they would have continued to work together and the value of the business would have continued." According to Young, because Hill refused to share income from the HealthCare Partners contract, she struggled to pay

9

LBAO's overhead expenses and was forced to leave the practice, which essentially destroyed the business.  She pointed out that Hill sought essentially the same category of damages; the only difference was that Hill blamed Young for destroying the practice, while Young blamed Hill.  Young also argued this was an issue for the jury to decide because, by the time the company is dissolved, there will be no value left for her to recover.

The court overruled Hill's objection, explaining it was up to the jury to decide whether Young still had an interest in the business and, if so, its value.  With respect to Young's breach of contract claim, the court told the jury she was seeking several categories of damages, including damages for "the loss of her half interest in [LBAO]."  The court separately instructed the jury on the categories of damages Young sought for breach of fiduciary duty, which included "loss of value of her half interest in LBAO." The court also instructed the jury it could award each item of damages only once, regardless of the number of legal theories alleged.  The court then listed the categories of damages subject to that rule, which included "loss of value of [Young's] half interest in LBAO."  Finally, the court provided a special verdict form that informed the jury it could award Young several categories of damages, including the "[v]alue of half of [the] business."

Young briefly addressed the damages issue in her closing argument, telling the jury "we want the value of half of the business of $300,000.  There's been testimony the business is worth somewhere between 600 to 800, $900,000, and there's been testimony that it's at a very small reduced value now. We attribute that loss of value to Dr. Hill.  But for his conduct,

10

they would still have a thriving practice, and they would be able to either go their separate ways and sell the practice or continue making money as they did."

Hill, in turn, urged the jury not to award Young any damages for the loss of her interest because she had voluntarily abandoned the practice. Hill instead urged the jury to award him $428,404 for the loss of value to his ownership interest. According to Hill, the practice had been worth twice that amount, but after Young left the practice, "[t]he value of the business now, as our expert testified, is zero prebankruptcy."

During deliberations, the jury submitted the following questions to the court: "What is going to happen to Dr. Young's shares after this? Is Dr. Young selling her shares back to Dr. Hill? . . . Will Dr. Young retain her shares after the trial?" The court responded that the jury's questions were "not relevant."

After receiving the court's response, the jury returned a special verdict awarding Young $300,000 for the "[v]alue of half of [the] business."

b. *Analysis*

We review challenges to jury instructions under the de novo standard of review. (*Sander/Moses Productions, Inc. v. NBC Studios, Inc.* (2006) 142 Cal.App.4th 1086, 1094–1095.) " ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably

11

susceptible to such interpretation.'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Despite Young's insistence that she did not seek compensation for the loss of her interest in LBAO, the court plainly told the jury that she did. Indeed, the court explicitly instructed the jury she sought damages for the "loss of her half interest in [LBAO]" in connection with her breach of contract claim. Neither the instruction nor the verdict form clarified that Young sought damages for the loss in value of her ownership interest, rather than for the loss of the interest itself. Whether or not this was intentional, it was error.

Although the court gave an erroneous instruction, "there is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) "'[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*Strouse v. Webcor Construction, L.P.* (2019) 34 Cal.App.5th 703, 713–714, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836; see *Collins v. County of San Diego* (2021) 60 Cal.App.5th 1035, 1055 ["an appellant must demonstrate that any alleged error in the jury instructions was prejudicial, i.e., that it was probable the appellant would have achieved a more favorable result without

12

the error"].) To determine whether an instructional error was prejudicial, we may consider the degree of conflict in the evidence on critical issues, whether argument to the jury may have contributed to the instruction's misleading effect, whether the jury requested a rereading of the erroneous instruction or related evidence, the closeness of the jury's verdict, and the effect of other instructions in remedying the error. (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 876.)

Here, it is not reasonably probable Hill would have achieved a more favorable result had the court properly instructed the jury. Despite the erroneous instruction related to damages for breach of contract, the court correctly instructed the jury on damages for breach of fiduciary duty. Specifically, it told the jury Young sought damages for the "loss of value of her half interest in LBAO," which was nearly identical to the jury instructions for Hill's claims. In another instruction related to economic damages, the court again told the jury Young sought damages for the "loss of value of her half interest in LBAO." It also instructed the jury it could award Young damages only once for the "loss of value" to the company. Consistent with those instructions, Young argued to the jury that Hill's conduct had caused the value of LBAO to decrease significantly. She never asserted Hill had caused her to lose her interest in the business.

It is also apparent the jury's $300,000 award was not intended to compensate Young for the loss of her entire interest in LBAO. Neither party's expert testified that Young's interest had been worth $300,000. Young's expert opined that, as of July 2019, LBAO was worth $674,741. Hill's expert valued the business significantly higher—$856,000—during the same time period. Had the jury intended to compensate Young for

13

the total loss of her 50 percent interest in the company, it likely would have awarded her half of one of those valuations. Instead, it awarded her less than half, indicating it determined her interest in the business retained some value. This makes sense only if the jury intended to compensate Young for the loss of value of her interest in LBAO, rather than the loss of the interest itself.

We acknowledge the jury's questions suggest it may have been confused about the nature of the damages Young sought. Young's plans for her shares after the trial would be relevant only if the jury were to award her compensation for the total loss of her ownership interest. The court, however, instructed the jury its questions were irrelevant, which implicitly conveyed that Young was not, in fact, seeking such compensation. Considered with the other instructions and the amount of the jury's eventual award, we do not think it is reasonably probable the jury continued to be confused after receiving the court's response.

On this record, Hill has not shown the court's instructional error was prejudicial. Accordingly, the error does not warrant reversal of the judgment.

2. ***The jury did not erroneously reject Hill's abandonment defense***

Hill argued at trial that Young was not entitled to damages for the loss in value of LBAO because she had abandoned her ownership interest in the company. The jury implicitly rejected this defense and, instead, awarded Young $300,000 in damages.

On appeal, Hill argues the jury erred because the undisputed evidence compels a finding that Young abandoned her interest in LBAO. In support, he points to evidence that, in July 2019, Young stopped working at LBAO, accepted a

14

position with a competing orthopedic surgery practice, stopped using LBAO's facilities, and stopped depositing funds into LBAO's account.  According to Hill, this evidence "clearly showcases [Young's] intent to abandon LBAO."

Generally, we review a jury's factual findings for substantial evidence.  (*Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 251.)  In this case, however, Hill raised the abandonment issue as an affirmative defense, meaning he had the burden of proof at trial.  (See *Peal v. Gulf Red Cedar Co. of California* (1936) 15 Cal.App.2d 196, 199 [describing abandonment argument as an affirmative defense].)  Where "the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.)  Instead, we must determine " 'whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Id.* at p. 466.)

The record in this case does not compel, as a matter of law, a finding that Young abandoned her ownership interest in LBAO.  "Before an abandonment may be found it is necessary to establish nonuse[ ] accompanied by unequivocal and decisive acts showing an intent to abandon."  (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1145.)  Young presented evidence

refuting both elements. She testified that, through the date of trial, she continuously claimed an ownership interest in LBAO, maintained her shares of the company, held onto her position as CEO, and monitored the company's books. Those actions do not reflect an intent to abandon her ownership interest.

That Young left the practice in July 2019 is not determinative. (See *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1059 [an ownership interest in a partnership " 'is derived from the formation of the partnership and is not dependent upon a partner's performance of duties and obligations under the agreement' "].) Young testified she accepted a different position because, without the income from the HealthCare Partners contract, she struggled to cover LBAO's overhead and was not able to pay herself much income. The jury reasonably could have found this explanation was plausible and did not reflect an intent to abandon her ownership interest. On this record, the jury reasonably could have rejected Hill's abandonment defense.

Hill's reliance on *Quinn v. Quinn* (1889) 81 Cal. 14, is misplaced. In *Quinn*, our state's high court held sufficient evidence supported a trial court's finding that a plaintiff abandoned his ownership interest in a quarry after he left the area for several months and told several people "that he had no interest in the quarry." (*Id*. at pp. 17–18.) Unlike in *Quinn*, the question here is not whether there is sufficient evidence that Young abandoned her interest in LBAO; instead, it is whether the evidence compels such a finding. Plainly, for the reasons discussed above, it does not.[2]

---

[2]	Even if Young had the burden of proof on the issue, for the same reasons, we would conclude substantial evidence supports

16

### 3. *The court did not err by failing to instruct the jury on the date of valuation*

During a discussion outside the jury's presence, the trial court noted it would not allow the jury to award Young damages based on a valuation of LBAO from before she left the practice. Instead, the court ruled, the jury must use a valuation of the company as of the time of trial. Despite this ruling, the court did not instruct the jury on which date to use to value LBAO. Hill argues the court's failure to do so warrants reversal.

Young contends Hill is barred from raising this issue on appeal because he did not timely raise it below. We agree. When " 'the court gives an instruction correct in law, but the party complains that it is too general, lacks clarity, or is incomplete, he must request *the additional or qualifying instruction in order to have the error reviewed.*' " (*Conservatorship of Gregory* (2000) 80 Cal.App.4th 514, 520; see *People v. Franco* (2009) 180 Cal.App.4th 713, 719 ["a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court"].) Hill never requested the court specifically instruct the jury on the date of valuation. His failure to do so forfeits the issue on appeal.

Even if we were to overlook the forfeiture, we would reject Hill's argument on the merits. While discussing the issue with the parties, it appears the court erroneously believed Young was seeking compensation for the loss of her ownership interest in LBAO. As discussed above, it is apparent Young instead sought

---

the jury's implicit finding that Young did not abandon her ownership interest in LBAO.

17

damages for the loss in value of her interest. To calculate those damages, the jury had to consider two valuations: a valuation without the wrongdoing and a valuation with the wrongdoing. The difference between the two is the loss of value. It would have been error, therefore, for the court to have instructed the jury to use only the value as of the date of trial.

We also reject Hill's argument that the jury improperly assumed LBAO had lost all its value as of the date of trial. As noted above, it appears the jury did not conclude the company had lost all its value. Even if it had, during his closing argument, Hill urged the jury to find LBAO's current value "is zero." Hill cannot complain on appeal that the jury ultimately agreed with him.

4. ***There is a sufficient nexus between Hill's misconduct and the loss in value to LBAO***

Hill argues there is an insufficient causal connection between his wrongdoing—failing to deposit into LBAO's account the income he received under the HealthCare Partners contract—and the loss in value of Young's interest in LBAO. He argues the undisputed evidence shows the loss was the result of Young's voluntary decision to leave the practice, rather than any wrongdoing on his part.

The test for causation in a breach of contract action is whether the breach was a substantial factor in causing the damages. (*Jenni Rivera Enterprises, LLC v. Latin World Entertainment Holdings, Inc.* (2019) 36 Cal.App.5th 766, 792.) At trial, Young testified she left the practice in July 2019 because, without the income from the HealthCare Partners contract, she was struggling to cover the company's overhead expenses and pay herself sufficient income. She also explained

18

that LBAO's lease was expiring at the time, and she was not willing to enter into a new lease with Hill while he was in breach of their partnership agreement. On this record, the jury reasonably could have concluded Hill's diversion of funds was a substantial factor in Young seeking alternative employment, which effectively destroyed the practice. Indeed, it would be unreasonable to expect Young to continue to work with Hill while he essentially was embezzling funds from the practice. Accordingly, we reject Hill's argument that there is not a sufficient causal connection between his wrongdoing and the loss in value to Young's ownership interest in LBAO.

5. ***Substantial evidence supports the jury's finding that Hill breached a contract with Young***

Hill argues there is insufficient evidence to support the jury's finding that he agreed to deposit into LBAO's account all the income from the HealthCare Partners contract. According to Hill, the record shows he and Young disagreed about whether the income belonged to LBAO. Therefore, he argues, there was a "fundamental lack of mutual consent" concerning how to handle the income, which precluded the jury from finding he was contractually obligated to deposit the funds into LBAO's account.[3]

---

[3] Young urges us not to consider Hill's arguments to the extent they concern the court's denial of his motion for JNOV, including his challenge to the sufficiency of the evidence supporting the jury's finding that he breached a contract. She argues that, because the denial of a JNOV motion is directly appealable, Hill was required to identify it specifically in his notice of appeal. Hill, however, identified only the amended judgment in his notice. We need not decide the issue because, even if we lack jurisdiction to review the court's denial of

"Contract formation requires mutual consent, which cannot exist unless the parties 'agree upon the same thing in the same sense.' (Civ. Code, § 1580; see also §§ 1550, 1565.)" (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.) "[T]he consent of the parties to a contract must be communicated by each party to the other. (Civ. Code, § 1565, subd. 3.) 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.' [Citation.]" (*Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 173.) "If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811.)

Whether mutual consent existed is a question of fact, which we review for substantial evidence. (*Martinez v. BaronHR, Inc.* (2020) 51 Cal.App.5th 962, 966.) In doing so, we presume the jury found every fact and drew every permissible inference necessary to support its verdict, and we defer to the jury's determination of the credibility of witnesses and weight of the evidence. (*Ibid.*)

Based on Young's testimony at trial, the jury reasonably could have found she and Hill orally agreed to deposit all the money generated from their partnership into LBAO. The jury also reasonably could have found this oral agreement governed

---

Hill's JNOV motion, we have jurisdiction to consider the same arguments in connection with our review of the final judgment and the denial of Hill's motion for new trial.

the income Hill received under the HealthCare Partners contract. Young presented evidence that—although Hill was the only party to the HealthCare Partners contract—he treated patients under the contract the same as any other LBAO patient. Because Hill was using LBAO's resources to care for those patients, it is reasonable to assume the parties would have wanted some agreement about how to handle the revenue and costs associated with the HealthCare Partners contract. It is undisputed, however, that the parties never specifically discussed those issues. This strongly suggests Hill and Young both understood the HealthCare Partners contract was to be governed by their preexisting agreement to contribute all income to LBAO. Consistent with such an understanding—and contrary to Hill's current claim that he believed the income belonged to him personally—Hill initially deposited into LBAO's account all the income he received under the HealthCare Partners contract.

On this record, the jury reasonably could have found Young and Hill implicitly agreed the income from the HealthCare Partners contract was subject to their 1999 oral agreement. The jury also reasonably could have found that, under the terms of the oral agreement, the income belonged to LBAO. That the record might support alternative findings is irrelevant. (See *Claussen v. First American Title Guaranty Co.* (1986) 186 Cal.App.3d 429, 431 ["We review the evidence on appeal in favor of the prevailing party, resolving conflicts and drawing reasonable inferences in support of the judgment."].)

6. ***The trial court did not err in granting Hill's motion for directed verdict on Young's conspiracy claim***

During a break in the trial, the court noted it had a problem with Young's conspiracy claim because "[y]ou can't have

21

[a] conspiracy between one person and his corporation. It has to be two separate individuals." The court gave the parties citations to several cases standing for that proposition. The court said it would "go over that [at a later time], but I'm just letting you know that legally, as alleged, it's not possible." Young said she would address the issue.

During a later discussion, the court noted it would not instruct the jury on conspiracy for the reasons it had explained earlier. The court remarked: "[Y]our whole theory is . . . that the conspiring party is Dr. Hill and his corporation. That is legally impossible. . . . [I]n order to have a conspiracy, you need two separate entities where there has to be a meeting of mind[s] to conspire. That's not the case here." Young did not respond.

On appeal, Young acknowledges the general rule that an agent of a corporation cannot conspire with the corporation. (See *Kerr v. Rose* (1990) 216 Cal.App.3d 1551, 1564 [a "corporation cannot conspire with its agents"]; *Black v. Bank of America* (1994) 30 Cal.App.4th 1, 4 [same].) Nevertheless, she argues the court erred because this case falls within several exceptions to that general rule. (See, e.g., *Black*, at p. 4.) However, Young did not make this argument in the trial court. Indeed, she did not even object when the court indicated it was inclined to grant a directed verdict in Hill's favor. Her failure to make a timely objection and advance these arguments below forfeits the issue on appeal. (See *Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1433 ["if an appellant wishes to argue a point on appeal, it must first make a record by raising the point in the trial court"].)

Even if we were to overlook the forfeiture, we would reject Young's arguments on the merits. A civil conspiracy requires

22

an express or tacit agreement to commit a civil wrong or tort. (*Navarrete v. Meyer* (2015) 237 Cal.App.4th 1276, 1293.) As best we can tell, Hill is the sole shareholder, principal, and employee of Hill, Inc. Therefore, in order to have conspired with the corporation, Hill must have reached an agreement with himself, albeit while operating in a different capacity. Young fails to present any authority that a civil conspiracy may be premised on an individual forming an agreement with himself in different capacities. Absent such authority, she has not met her burden to demonstrate reversible error.

7. ***The trial court erred in granting Hill's motion for directed verdict on Young's concealment claim and request for punitive damages***

After Young presented her case, the court granted a directed verdict for Hill on her fraudulent concealment claim, apparently on the basis that Hill had no duty to disclose his diversion of funds if the information was otherwise available to Young. The court explained the evidence showed that, once Young started looking at LBAO's financial records in 2017, it took her only a few days to discover Hill had not been contributing all the income from the HealthCare Partners contract. The court also granted a directed verdict for Hill with regard to Young's request for punitive damages, noting this was "simply a contract dispute" that lacked any evidence of oppression, malice, or fraud. Young argues the court erred because she presented sufficient evidence to support her concealment claim and request for punitive damages.

"A directed verdict is . . . subjected to de novo appellate review. . . . 'A motion for a directed verdict "is in the nature of a demurrer to the evidence, and is governed by practically

23

the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom." ' " (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210, fn. omitted.)  " 'A defendant is entitled to a [directed verdict] if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor.  [Citation.] "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses.  Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. . . ." ' "  (*Colbaugh v. Hartline* (1994) 29 Cal.App.4th 1516, 1521.)

" ' "The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' "  (*Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1239.)  "Concealment is a term of art which includes mere nondisclosure when a party has a duty to disclose." (*Reed v. King* (1983) 145 Cal.App.3d 261, 265.)  There are four circumstances under which a defendant's nondisclosure may amount to actionable fraud:  "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." (*Heliotis v. Schuman* (1986) 181 Cal.App.3d 646, 651.)

Here, there is sufficient evidence from which the jury reasonably could have found all the elements of a fraudulent concealment claim. As to the first element, given the jury's finding that Hill was in a fiduciary relationship with Young— a finding Hill does not meaningfully challenge on appeal— the jury could have found he had a duty to disclose to Young any diversion of LBAO's funds. It is undisputed, however, that Hill waited several years to reveal to Young that he had been depositing checks from the HealthCare Partners contract into his own account.

There is also sufficient evidence from which the jury could have found Hill had the requisite knowledge. As discussed above, Young presented evidence that she and Hill entered into an oral agreement under which they agreed to share all income from the practice. The jury could have found Hill was aware this agreement governed the HealthCare Partners contract and required that he deposit all the income he received into LBAO's account. Indeed, he did precisely that for several years. For the same reasons, the jury could have found Hill knew he had a duty to disclose to Young his diversion of funds, yet he knowingly declined to do so.

Young also presented sufficient evidence to prove Hill acted with a fraudulent intent. It is reasonable to infer from the circumstances that Hill knew Young would be upset that he was diverting LBAO funds into his own account. It is also reasonable to infer Hill concealed that information from Young so she would not seek the money owed to her and would continue contributing to the practice.

Finally, there is sufficient evidence of the two remaining elements: justifiable reliance and resulting damages. The jury

25

reasonably could have found that, based on their past work history and personal friendship, Young trusted Hill and did not suspect he was diverting funds from the practice. Young, moreover, testified that, shortly after discovering Hill's actions, she confronted him and demanded he repay her. Based on this evidence, it is reasonable to infer that, had Hill disclosed his diversion of funds earlier, Young immediately would have taken action to recover her share of the funds. The jury also reasonably could have found Young suffered damages by continuing to contribute to the practice while receiving significantly less compensation than she was owed.

Viewing this evidence in the light most favorable to Young—as we must—the jury reasonably could have found she proved all the elements of a claim for fraudulent concealment.

Based on the same evidence, the jury also reasonably could have found Hill was "guilty of . . . fraud," which would warrant an award of punitive damages. (See Civ. Code, § 3294, subd. (a) [a jury may award punitive damages where there is clear and convincing evidence of fraud].) Indeed, we see no meaningful distinction between Hill's alleged misconduct and theft by embezzlement, which is a type of fraud. (See Pen. Code, § 503 ["Embezzlement is the fraudulent appropriation of property by a person to whom it has been intrusted."]; CALCRIM No. 1806 [restating the elements of theft by embezzlement].) The court, therefore, erred by entering a directed verdict in favor of Hill on Young's concealment claim and request for punitive damages.

Hill argues he could not be found liable for fraudulent concealment because the record shows Young would have discovered his diversion of funds had she exercised reasonable diligence. Hill, however, overlooks that the jury could have

26

found—and did, in fact, find—he and Young were in a fiduciary relationship, which would excuse any diligence requirement. As the California Supreme Court has explained, when parties are in a fiduciary relationship, " ' "there is no duty of inquiry until the relationship is repudiated. The nature of the relationship is such as to cause the plaintiff to rely on the fiduciary, and awareness of facts which would ordinarily call for investigation does not excite suspicion under these circumstances." ' " (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240; see *Bennett v. Hibernia Bank* (1956) 47 Cal.2d 540, 559–560 ["where a fiduciary relationship exists, facts which would ordinarily require investigation may not excite suspicion"]; see also *Hobbs v. Bateman Eichler, Hill Richards, Inc*. (1985) 164 Cal.App.3d 174, 202 ["[w]here there is a fiduciary relationship, the usual duty of diligence to discover facts does not exist"].) Whether Young easily could have discovered Hill's misconduct might be relevant to the issue of justifiable reliance, but it does not present a complete bar to her claim.

 *Mesmer v. White* (1953) 121 Cal.App.2d 665 is distinguishable. The parties in that case were not in a confidential relationship, so the party accused of fraudulent concealment did not have a special duty of disclosure. (*Id*. at pp. 669–670.) Absent a special duty, the fact that the other party could have discovered the truth "had diligent inquiry been made" was enough to defeat his fraud claim. (*Id*. at p. 674.) Here, in contrast, the jury reasonably could have concluded Young and Hill were in a fiduciary relationship, which imposed on Hill a duty to disclose his diversion of funds and relieved Young of any inquiry obligation. *Mesmer*, therefore, is inapposite and no help to Hill.

27

**8.** ***The court erred in eliminating the jury's award***
***of prejudgment interest***

Young argues the court erred by eliminating the jury's award of prejudgment interest. She contends the court erroneously believed the jury awarded her interest under Civil Code section 3287, rather than Civil Code section 3288.

a. *Background*

The court instructed the jury it had discretion to award prejudgment interest on any damages it awarded to either party. The court also instructed the jury with CACI No. 3935, which is a standard jury instruction concerning prejudgment interest under Civil Code section 3288. The jury, in turn, awarded Young $222,167 for "[i]nterest on profits taken by Defendants." The special verdict form did not indicate whether the jury awarded the interest on the damages for the breach of contract, the breach of the implied covenant of good faith and fair dealing, or the breach of fiduciary duty.

In his post-trial motions, Hill argued the jury's interest award was excessive and legally impermissible. He asserted the court had improperly instructed the jury it could award Young interest under Civil Code section 3288, which applies only to non-contractual claims. According to Hill, Young was not entitled to interest under that statute because the court had dismissed her fraudulent concealment claim, which was her only non-contractual claim. Hill alternatively argued the jury used an excessive interest rate to calculate the award.

In opposing Hill's motions, Young focused her argument on his contention that the jury had used an excessive interest rate. In passing, she also noted that, even if she were not entitled to non-contractual interest, the award "need not fall under Civil

28

Code section 3288." Young did not specify on what other basis the jury could have awarded her interest.

The court agreed with Hill and eliminated the jury's award of prejudgment interest. Although not entirely clear, the court seemed to base its decision on its belief that the jury awarded Young interest under Civil Code section 3287, rather than Civil Code section 3288. The court determined this was error because a plaintiff's entitlement to interest under Civil Code section 3287 presents a legal question for the court to decide. The court then determined Young was not entitled to such an award because her damages were not certain or readily calculable, as required under Civil Code section 3287, subdivision (a).

b. *Analysis*

Whether a plaintiff is entitled to prejudgment interest depends on the nature of the claim and the type of damages sought. Under Civil Code section 3287, a plaintiff is entitled to interest on "damages certain, or capable of being made certain by calculation . . . ." (Civ. Code, § 3287, subd. (a).) Alternatively, under Civil Code section 3288, a jury has discretion to award interest in "an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice . . . ." A jury may award interest under Civil Code section 3288 "[w]hen, by virtue of the fraud or breach of fiduciary duty of the defendant, a plaintiff has been deprived of the use of his money or property and is obliged to resort to litigation to recover it," such that the inclusion of interest is necessary to make the plaintiff whole. (*Nordahl v. Department of Real Estate* (1975) 48 Cal.App.3d 657, 665.)

Young contends that, because she prevailed on her breach of fiduciary duty claim—which was premised on a

29

non-contractual obligation—the jury had discretion to award her interest under Civil Code section 3288. Hill concedes the point. Nevertheless, he contends Young forfeited the issue by failing to raise it in opposition to his post-trial motions.

Although the forfeiture rule generally precludes a party from making a new argument on appeal, it is not absolute. A reviewing court may consider a new argument on appeal if it involves a legal issue based on undisputed facts. (*Krechuniak v. Noorzoy* (2017) 11 Cal.App.5th 713, 725.) Here, whether the court erred by reducing the jury's award of interest is a pure question of law, and it does not turn on any disputed facts. Indeed, Hill essentially concedes that, had Young made the argument below, the trial court would have (or at least should have) ruled in her favor. We decline to apply the forfeiture rule under these circumstances.

Hill alternatively contends Young forfeited the issue by failing to file her own motion for a new trial seeking interest under Civil Code section 3288. We are at a loss to understand why she would have been required to do so. After all, the jury awarded Young interest under Civil Code section 3288, so there was no reason for her to move for a new trial.

Hill next argues Young cannot recover prejudgment interest because she failed to request that the jury identify for which claim it made the award. Therefore, he argues, there is no way to tell whether the jury awarded interest on the damages for breach of contract—which would be improper—or on the damages for breach of fiduciary duty—which is permitted under Civil Code section 3288.

We acknowledge Young should have requested that the special verdict form ask the jury to determine damages for each

30

of her claims separately.  Indeed, the court brought the potential issue to her attention, but she declined to heed its advice. However, Hill approved a similar verdict form for his request for interest, which also did not ask the jury to differentiate between his contractual and non-contractual claims.  We highly doubt that, had the jury found in Hill's favor and awarded him interest, he would have conceded the verdict form was fatally defective.

In any event, the ambiguity in the verdict form does not warrant overturning the jury's award.  Young's contractual and fiduciary duty claims were premised on essentially the same facts—Hill's diversion of income from the HealthCare Partners contract—and she sought identical damages for each—the profits she would have earned on that income and the loss in value of her interest in LBAO.  The jury found Young proved all her claims, and we can conceive no reasonable basis for it to have determined she suffered different damages for each.  For the same reason, we can conceive of no plausible reason why the jury would have awarded Young prejudgment interest for the contractual claims, but not the same interest for the breach of fiduciary duty claim, especially given the court instructed the jury to use the same standard to determine whether to award interest for both types of claims.  It is apparent, therefore, that had the court instructed the jury to calculate damages for each claim separately, the jury would have awarded Young $222,167 of interest on the damages for the breach of fiduciary duty. Accordingly, any ambiguity in the special verdict form does not warrant invalidating the jury's award.

31

**9.** ***The court erred in reducing the jury's award of loss-of-value damages***

In his post-trial motions, Hill argued the evidence did not support the jury's decision to award Young $300,000 for loss-of-value damages. According to Hill, neither expert testified to that amount, and Young's expert erroneously assumed Young would continue to work at the practice. Hill also argued the jury should have awarded damages based on LBAO's value as of the date of trial, when the business was at a " 'pre-bankruptcy' " and " 'pre-liquidation' " level.

The court agreed with Hill in part, finding the jury's award was excessive. The court reasoned, "Plaintiff's expert valued the practice on the assumption that two physicians would be working in the practice, and that assumption was incorrect. It is undisputed that Plaintiff left the practice and had not been working there since July 19, 2019 well before the date of valuation. The court believes that one physician working should reduce Plaintiff's damages by half." The court, therefore, conditioned the denial of Hill's motion for new trial on Young agreeing to a reduction in her loss-of-value damages from $300,000 to $150,000.

"[W]hen a trial court grants a new trial on the issue of excessive damages, whether or not such order is conditioned by a demand for reduction, the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order." (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 932.) Therefore, we will reverse an order reducing damages on the ground that they were excessive only if the trial court abused its discretion. (*Id.* at pp. 932–933; see *Pearl v. City of Los Angeles* (2019) 36

Cal.App.5th 475, 486 ["We review the trial court's use of its power of remittitur to reduce excessive damages for abuse of discretion."].)  A court abuses its discretion when, considering the law and all the relevant circumstances, its decision " ' "exceeds the bounds of reason and results in a miscarriage of justice." ' " (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 378.)

Here, it appears the trial court reduced Young's damages based on a misunderstanding of the basis for the jury's award. Although not entirely clear, it seems the court erroneously believed the jury was compensating Young for the loss of her interest in LBAO.  In fact, the jury was compensating Young for the loss in value of that interest.  To calculate those damages, the jury had to consider LBAO's value without the wrongdoing and its value with the wrongdoing.  The parties agreed LBAO was worth more than $600,000 when they both were working at the practice, and its value decreased significantly—to a pre-bankruptcy level—after Young left the practice.  Given those valuations, the jury reasonably could have determined Hill's wrongdoing caused LBAO's value to decrease by $600,000. Because Young owned 50 percent of the business, her share of the loss would be $300,000.

The jury's award was reasonable, and there was no basis for the trial court to reduce it by half.  The court, therefore, abused its discretion by conditioning the denial of Hill's motion for new trial on Young's agreement to a reduction in her damages.

**DISPOSITION**

We reverse the judgment on Young's fraudulent concealment claim and request for punitive damages, and we remand the case for a new trial on these issues. On remand, the court shall reinstate the jury's damages award, including the award of interest. We affirm the judgment in all other respects. Serena Young shall recover her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


EDMON, P. J.


LAVIN, J.

34